# Wheeling.

## HALL et al. v. THE BANK OF VIRGINIA et al.

### Decided December 21, 1878.

1878
Special Term.

1. In November 1864, during the late war H. and S. issued an attachment in a chancery suit against the Bank of Virginia, as a non-resident for a debt of $36,500.00, being notes of that bank owned by them, some of which were payable at branches of that bank in Virginia and had not been presented at such branch-banks for payment. HELD:

    I. The attachment was properly issued against the Bank of Virginia as a non-resident.

    II. The court properly decreed the payment of the whole of this $36,500.00 out of the attached effects of the bank.

2. The Bank of Virginia pending such suit conveyed all its assets and choses in action, under the act of the Legislature of Virginia of February 12, 1866, to S. and T. trustees, for the satisfaction of its creditors. M. instituted a suit in the circuit court of the United States for the Eastern District of Virginia against these trustees to have the trust executed under the supervision of that court, and the court ordered these trustees as receivers to sell all the assets of the Bank of Virginia. They did so; and I. became the purchaser of the assets of this bank at its branch at Charleston, which had been attached by H. and S.; and the trustees assigned these assets to I. HELD:

    That the counsel of these trustees and of I. had a right, in the name of the Bank of Virginia, to take and prosecute an appeal from the decree of the circuit court in said attachment-cause.

3. This cause was heard with seven other attachment-causes against the Bank of Virginia. There was no controversy as to prior-

ities or otherwise among the plaintiffs in these several causes, and the assets of the Bank of Virginia attached were disposed of by the court by a decree, to which the plaintiffs in all these causes assented. HELD:

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

The Bank of Virginia could take an appeal in one of these causes alone, and such an appeal did not bring up the proceedings in the other causes for review.

Appeal from two decrees of the circuit court of Kanawha county, rendered, the one on the 18th day of October, 1866, and the other on the 15th day of April, 1869, in a certain suit in chancery therein pending, in which John Hall and Benjamin H. Smith were plaintiffs, and the president, directors and company of the Bank of Virginia and others were defendants, taken by the said president, directors and company of the Bank of Virginia.

Hon. Daniel Polsley, late judge of the seventh judicial circuit, rendered the decrees appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case:

The plaintiffs, John Hall and Benjamin H. Smith, sued out of the clerk's office of the circuit court of Kanawha county on November 30, 1864, a summons in chancery against the president, directors and company of the Bank of Virginia and others defendants; and at the same time they made an affidavit before the clerk of said court in his office, that the president, directors and company of the Bank of Virginia was a foreign corporation and was indebted to them in the sum of $36,500.00, and that the claim or debt was just, that they had present cause of action therefor, that the said bank was a non-resident of West Virginia, or was not located in or incorporated by this State, and that they believed it had estate or debts due it in the county of Kanawha from the other defendants residents of said county.

On the summons was endorsed, that the object of the suit was to enforce the payment of $36,500.00 alleged by this

affidavit to be due from the president and directors of the Bank of Virginia; and the sheriff of Kanawha county was commanded to attach the lot and the vault therein in the town of Charleston, mentioned in the bill, in the possession of Levi J. Woodyard in said town and all the effects in it, consisting of specie or notes on banks, notes discounted by said bank and bonds held by it as collateral security; and United States treasury notes the property of said bank, also the debts due or to become due said bank whether in their own hands, or in the hands of other defendants or persons whatsoever, and such estate so attached in his hands to secure, so that the same should be liable to the future order of the court, which was signed by the clerk. It was returned served on the defendant, L. J. Woodyard, and eight other defendants; not found as to Samuel Shrewsbury; and not found and no inhabitant as to the other seventeen defendants; and also levied on the lot, vault and contents.

The bill was filed at December rules, 1864. It set forth that the president, directors and company of the Bank of Virginia were indebted to the plaintiffs for divers promissory notes issued by said bank and payable partly at Richmond, and for the residue at their several branches in Virginia, and their branch at Charleston, now in West Virginia, in notes of various denominations amounting to the sum of ———, which notes the bill states were deposited with the Bank of West Virginia, at Charleston, in said county, subject to the order of the court, which notes the bill asked might be taken charge of by the court and considered as a part of the bill. That this bank was incorporated by the State of Virginia and is situated and established in the city of Richmond and is a foreign corporation to the State of West Virginia. That the branches of this bank are inaccessible to the plaintiffs, except those at Norfolk and Portsmouth from which all the assets have been removed. That the branch at Charleston has assets more than sufficient to pay the plaintiffs' debt, which bank has not been removed to any

point within the bounds of the rebellion. That its assets were left in the hands of its president, who placed them in the possession of Levi J. Woodyard one of the defendants. That in the safe of said bank, in Woodyard's possession, were notes of other banks of Virginia to the probable amount of $30,000.00, and notes of the Bank of Virginia to the probable amount of $60,000.00, and divers promissory notes of individuals, and among them the notes or bonds of the numerous other home-defendants named in the bill, besides other evidence of debt to be found in said safe. And that there is also in said safe gold and silver belonging to said bank. And that there is also under the control of said Woodyard, United States treasury notes belonging to said bank. That the bank also owns a lot in Charleston, on which their banking house was built, which was burned down in September, 1862. That some of the debtors of said bank, defendants to this suit, are non-residents, to-wit, the seventeen returned by the sheriff as non-residents. That some of the debtors, defendants, had given liens to secure their indebtedness, or judgments had been rendered against them ; and that these non-resident debtors had real or personal estate or both in Kanawha county. The prayer of the bill is, that the parties named in the summons may be made defendants and required to answer the bill ; that the above named assets of the bank may be attached, and all other assets of it that may thereafter be found, and that they may be disposed of by the court, and applied to the payment of the plaintiffs' debt ; and the amounts due from the garnishees might be enforced and so applied ; and for general relief.

Order of publication was duly made against all the parties named as non-residents ; and an alias summons served on the remaining home-defendant, Samuel Shrewsbury, on whom the original summons had not been served.

On the 8th of April, 1865, the State of West Virginia tendered a petition verified by affidavit asking to be made a defendant, and James W. Hoge, administrator of

John G. Wright, filed his answer also verified by his affidavit. He demurred to the bill, and for answer said, that he was informed, and believed, that the bank notes held by the plaintiff were purchased at a large discount. He says his intestate was indebted to the bank in some amount not known to respondent, evidenced by one or more notes, on one or more of which he was individually endorser and will probably have to pay; that he was a depositor in the bank to the amount of between $500.00 and $700.00, and he claims this as an off-set.

On April 10, Levi J. Woodyard, the general receiver of the court, was ordered to take charge as such of all the assets of the bank at Charleston, giving the parties to the suit a right to inspect them, under his supervision.

And on June 17, 1878, John H. and Wm. F. Goshorn tendered their petition, to be made defendants to the suit.

At November rules, 1865, an amended bill was filed. It stated the amount of the plaintiffs' debt to be $36,500.00 and it asks that Spicer Patrick, who owed said bank some $9,500.00, might be made a defendant, and the amount due from him attached, which was accordingly done; and a summons and attachment also issued and was served on Clement Smith as a garnishee.

On the 20th of December, 1865, this cause and six others, in which the Bank of Virginia and others were defendants, were heard together; and at the request of the plaintiffs in their several suits, attaching creditors, Joel Ruffner on giving bond in the penalty of $50,000.00 was directed to enforce the collection of the promissory notes due the bank, which had been attached, or if he declined to do so, the general receiver was ordered to enforce their collection.

On April 4, 1866, the Bank of Virginia filed its answer. It admits that it was a corporation of the commonwealth of Virginia, with a branch located in the town of Charleston till the formation of the State of West Virginia; and it submits the question to the decision of

the court, whether it is such a foreign debtor or corporation, that an attachment of its effects would lie; and also whether as the promissory notes of the bank held by the plaintiffs were payable on demand at various places of payment designated on the face of the notes, and they were never presented at these places for payment, this suit could properly be instituted.

It insists, that the plaintiffs could not legally during the war go into the hostile territory held by Confederate authority without license, and speculate, buy or sell notes of this bank, and that such contracts ought not to be enforced; and it is informed, and believes, the notes of this bank, which are the basis of this suit, were so purchased by the plaintiffs since the formation of the State of West Virginia.

It also insists that the assets of the Bank of Charleston cannot be legally subjected to the payment of notes issued by other branches, especially as all bars to their presentation and demand at the places where they were payable had been removed.

It is also submitted to the court to decide, whether the plaintiffs' claim can override that of depositors in the bank at Charleston. And it insists, that such a case as is presented by the plaintiffs does not fairly come within the provisions of our attachment laws. It repudiates an arrangement made by the late president of the bank at Charleston to redeem with assets of the bank a claim of Smith and Hale, and says it was made under such circumstances as not to be binding. What this arrangement was it does not specify; and it is not shown by the record of this case. It says: that this illegal arrangement rendered the branch of the Bank of Virginia, at Charleston, insolvent, many notes of other branches being thereby discharged with its assets, and that otherwise it could have paid all its proper liabilities. It further charges, that Smith and Hale were both officers in the rebel army and have assigned large claims in this attachment to the plaintiffs to evade the law of West

Virginia, and that they are interested in this suit. And they call for strict proof of all things not admitted in this answer.

R. C. M. Lovell filed his answer, alleging that he paid on March 16, 1864, to the president of the Bank of Virginia, at Charleston his whole indebtedness, and denying that he owed said bank anything. And he files with his answer the receipt in full of his indebtedness due that day and signed by said president.

S. Patrick also filed his answer, in which he states that he owes the Bank of Virginia two notes one of $600.00 dated May 22, 1861, payable at sixty days, and the other for $6,000.00 dated August 7, 1861, payable in sixty days; that Goshorn and Lovell had a claim against the Bank of Virginia, which amounted on May 29, 1865, to $8,196.56, on which they brought a suit in chancery and attached these debts due from the respondent, which attachment was served on the respondent before the attachment in this cause; that the respondent on July 19, 1866, became the owner of this debt of Goshorn and Lovell by an assignment filed with the answer, which he claims as an off-set, and says the balance due him is between $2,000.00 and $3,000.00.

The petition of the State of West Virginia, before referred to as tendered before the filing of the answer of the Bank of Virginia, sets out no facts not set forth in the answer of James W. Hoge, administrator of John G. Wright, except that the State of Virginia prior to the war owned three-fifths of the stock of said Bank of Virginia, and that by the act of February 3, 1863, all the right, title and interest of the State of Virginia in said branch of said Bank of Virginia, at Charleston, was transferred to the State of West Virginia; that the Bank of Virginia does not appear to defend this suit, and if the State of West Virginia is not allowed to defend this suit, her interest will be seriously compromised, if not destroyed; when admitted as a defendant she prays, that her petition may be regarded as an answer and cross-bill,

and that the plaintiffs be required to answer on oath, and say, when and where they purchased and became the owners of the notes sued on, and under what circumstances and of whom the same were purchased, what they paid for each of these notes, and whether they, or any of them, were purchased within the rebel lines, and whether they were not paid for in Confederate notes, and whether other persons are not interested in said notes, and they held in trust for them, and if so, when and what portion of said notes are on the branch of the Bank of Virginia, at Charleston, and what portion on other branches; and that, if the assets of said bank are to be charged, only so much shall be allowed the plaintiffs as they actually paid in good currency for the notes on the Charleston branch of said bank. This petition was sworn to.

J. H. and W. F. Goshorn in their petition heretofore stated to have been tendered, state that they are creditors by deposits in the Bank of Virginia, at Charleston, to a large amount, that they had instituted generally attachment suits in the circuit court of said county against the Bank of Virginia as a foreign corporation, which have been duly levied on the assets of said bank at Charleston; and they ask that the records of these suits may be taken as a part of their petition. They claim that the plaintiffs' pretended lien in this suit is invalid. They pray to be made defendants to this suit, and when so admitted that their petition may be regarded as an answer and cross-bill, and the plaintiffs be required to answer the same on oath, and make disclosures, the same as those set forth in the requisition of the petition filed by the State of West Virginia, with reference to when, where and at what prices they purchased these notes and what portion of them were payable at the branch at Charleston; and that the plaintiffs be not allowed more than the amount paid in good currency for those notes, which were payable at the branch of said bank at Charleston; and they pray for general relief.

. The petition of Charles Ruffner before referred to states, that he had on special deposit in said branch of the Bank of Virginia, at Charleston, a pocket book containing several bonds and other valuable papers; and he asks that an order be made to deliver them up. These petitions were all sworn to.

It is unnecessary to set out the record referred to as exhibits with the answer of S. Patrick. It shows that a commissioner of the court in that cause made February 15, 1866, a report, in which he says the balance due Goshorn on account of deposits made in said branch of the Bank of Virginia at Charleston, West Virginia, as it appears from the books of said bank, is $8,196.56. The date of his last deposit is July 12, 1861. This report was not excepted to by any party.

On October 18, 1866, Levi J. Woodyard, receiver, made a report, in which he states that there were in his hands uncurrent notes: on the Bank of Virginia, $64,500.00; on Farmers' Bank of Virginia, $11,700.00; on Bank of Valley of Virginia, $3,700.00; on Exchange Bank of Virginia, $8,800.00; mixed notes and certificates of deposit, $18,060.00; total, $106,706.00; that he had in his hands, collected of Wm. H. Wender, a net amount of $8,958.21; of J. J. Thompson, $6,026.25 and of John M. Doddridge $2,240.65; and that he has incurred some expenses to be hereafter reported.

On October 18, 1866, the court rendered a decree in this cause, and in the cause of Goshorn & Lovell *v.* The Bank of Virginia *et al.*, and five other attachment cases against said bank, which were heard together. This decree recites "that these several causes came on to be heard together; the case of Smith and Hall *v.* The Bank of Virginia *et al.* on the bill and amended bill and exhibits therewith filed, the several answers hereinbefore stated and replications thereto severally, and the several petitions aforesaid, the bill taken for confessed as to the several parties before referred to on whom process was served, and the order of publication duly executed as to

all non-resident defendants aforesaid; and in the case of Goshorn and Lovell *v.* The Bank of Virginia *et al.* on the bill and amended bill and answers filed in the case and general replication thereto, the bill taken for confessed as to certain defendants served with process and order of publication duly executed, and cause set for hearing as to the non-resident defendants therein, and on the report of the commissioner aforesaid; and in the other four causes on the papers and proceedings in them recited. Upon mature consideration of all which, and upon the arguments of counsel therein, the court was of opinion and did decide, that the Bank of Virginia was justly indebted to Goshorn and Lovell in the sum of $8,196.56 with legal interest thereon from the 29th of May, 1865, until paid; and that the said bank was a non-resident corporation; and that said Goshorn and Lovell had levied an attachment upon S. Patrick (among others) who acknowledged in his answer that he was indebted to said bank in the sum of $6,600.00 with interest on $600.00, part thereof, from the 25th day of July, 1861, till paid and on $6,000.00, the residue thereof, from the 10th day of October, 1861, till paid; and that said attachment was prior in time to that of any of the other attaching creditors in these causes; and that it appeared from an assignment filed by said Patrick with his answer, that he had become the owner of the debt of said Goshorn and Lovell *v.* The Bank of Virginia, since the institution of that suit. It was therefore adjudged, ordered and decreed, that the debt of said Patrick to the bank which amounted then to $8,597.00 should be set off against the debt due from the Bank of Virginia to Goshorn and Lovell amounting to $8,878.24, leaving a balance due to said Patrick as assignee of Goshorn and Lovell of $281.24; but that he should not have the benefit of this off-set and decree, until he should first give bond with good security before the clerk of the court in the penalty of $12,000.00, conditioned to perform such future orders as may be made upon the appearance of the president, directors and company

of the Bank of Virginia and their making defense in that cause ; and when said bond was given, the receiver of the court was directed to dismiss his common law suits against Patrick.

And the court was further of opinion and decided, that the Bank of Virginia was justly indebted to the plaintiffs, Hall and Smith, in the sum of $36,500.00 with legal interest thereon from November 30, 1864, until paid ; and that the said bank was a non-resident corporation ; and that the said plaintiffs, Hall and Smith, had levied an attachment, which was prior in time to the attachment of the other creditors, on a certain safe and vault and its contents belonging to said bank, and as it appeared by the report of Levi J. Woodyard, the receiver of the court, that they contained and then still contain $64,500.00 in notes of the Bank of Virginia ; $11,700.00 in notes of the Farmers' Bank of Virginia ; $3,700.00 in notes of the Bank of the Valley of Virginia ; $8,800.00 in notes of the Exchange Bank of Virginia, and $18,060.00 in notes and certificates of deposits in different Virginia banks ; and it was therefore adjudged, ordered and decreed, that Charles Hedrick and W. E. G. Gillison, special commissioners, should after giving bond and security in the penalty of $30,000.00 take possession of said concurrent notes and certificates of deposit, and proceed to sell the same for cash at such place and in such manner as they should think best, and make report thereof to the court.

And by the consent of the plaintiffs in their several suits and of the defendants, the Bank of Virginia, it was further ordered, that said special commissioners should proceed to sell the lot in the town of Charleston, the property of the bank, for ten per cent of the purchase money in cash and on a credit of six, twelve and eighteen months as to residue, taking bond with good security of the purchaser and retaining a lien on the property for the same, the sale to be made after giving thirty days notice thereof in a newspaper published in Kanawha

county. The court also ascertained and decreed, that the amount due complainants in one of the causes, J. W. & W. F. Goshorn, was $8,039.86, and rendered a decree therefor against certain garnishees as to whom their attachment was served before that of the other creditors.

The court in its said decree further ascertained and adjudged, that there was due to Samuel Campbell's executor, one of the plaintiffs in said causes, $14,327.75 with interest from February 4, 1865, and to J. H. & W. F. Goshorn, the plaintiffs in another of said causes $8,039.86, with legal interest from February 4, 1865, a portion of which was above ordered to be paid; and that the plaintiffs in these three causes levied their attachments simultaneously on John M. Doddridge, a debtor of the bank, and that they were as to this garnishee prior to the other attachments, and that the amount collected by the receiver of Doddridge and for distribution was $2,286.37, and that it should be distributed *pro rata* among these three plaintiffs in proportion to their debt; which was done and the amounts coming to them respectively ordered to be paid by the receiver, L. J. Woodyard.

And the court in its said decree further decided, that the amount due to the executor of William Dickison, the plaintiff in another of said causes, was $37,647.91 with interest from December 14, 1865, and that his attachment was served on the garnishee, Wm. H. Winder, a debtor of the bank, and was as to this garnishee prior in time to any of the attachments of any of the other creditors; and that there was in the hands of the general receiver collected of Winder the net sum of $8,958.21. It therefore ordered this sum to be paid by the general receiver to said Dickison's executor.

And the court also ascertained, that the amount due to John Timms, the plaintiff in another of said causes, was $580.00 with interest from May 1, 1865, and that his lien on a sum of $5,801.23 collected of one of the garnishees, John J. Thompson, was next in priority of time

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

to that of the plaintiffs, Hall and Smith, and that they had liens on other funds more than sufficient to pay their debt. It therefore ordered that the debt due said Timms should be paid by the general receiver out of this fund collected of Thompson, and that the balance of it should be paid to Smith and Hall, plaintiffs. The court further required, before the benefit of this decree should be had by any of the plaintiffs, they should give bond and security, as required by law, in sundry penalties fixed by the court, conditioned to perform such future order as might be made upon the appearance of said bank and its making defense.

This decree in each of said causes before ascertaining and decreeing the amount due each of the plaintiffs severally adjudged, that the Bank of Virginia was a non-resident corporation.

The entire decree was consented to by each of the plaintiffs in each of these causes, but not by the defendants, except that the Bank of Virginia assented to so much of the decree as ordered the sale of their lot in Charleston.

The commissioners Hedrick and Gillison, reported that they had given the required bond with security, and had obtained from the general receiver the lots of money specified in the decree appointing them, and had sold these lots of notes, specifying them in detail, and the price obtained for each. Their entire sale amounted to $30,825.46, the total face value of these notes being $95,447,00, of which $69,046.00 were notes of the Bank of Virginia, which they sold at the rate of 35¾ cents for one dollar. The amount then realized deducting all expenses was $30,062.91.

They further state, that the certificates of deposit were specifically endorsed by the late president of the branch of the Bank of Virginia at Charleston, (then dead) to the credit of the bank at Charleston or the bank at Richmond, and were therefore not negotiable and could not be sold. They amounted to $11,730.00. They returned

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

as unsold for want of a bidder a Virginia treasury note of $60.00, notes of the Bank of the Commonwealth $47.00, of the Bank of Howardsville $5.00, of the Central Bank of Virginia (unsecured) $85.00, and a note of the Farmers' Bank of Virginia of $10.00 pronounced counterfeit; that they, on account of the probability that the succeeding term of the court would not be held, lent the sum in their hands $30,062.91 to the plaintiffs, Hall and Smith, on November 7, 1866. They also report their failure to make sale of the lot in Charleston after several ineffectual efforts to sell the same.

The president, directors and company of the Bank of Virginia excepted to this report for the following reasons: 1st. The commissioners acted without authority. 2d. The commissioners erred in selling the $69,046.00 notes of the Bank of Virginia, they having been returned from circulation by redemption by the Bank of Virginia 3d. The commissioners had no authority to loan to the plaintiffs, Smith and Hall, the $30,062.91. 4th. The pretended decree, under which the commissioners acted, was never adjudicated by the court, but was entered in consequence of fraudulent representations by the plaintiffs that it was a consent decree.

On June 24, 1867, in the same seven causes before heard together, and in the cause of Stewart Eagle's adm'r v. The Bank of Virginia et al. heard now with them, the court adjudged that S. Eagle's judgment rendered February term, 1869, of the county court of Kanawha county, against the president and directors of the Bank of Virginia is the first lien on their real estate located in the county of Kanawha; and on the 3d day of October, 1867, the court decreed, that a sale of the lot in Charleston, which had been made by the special commissioners, be confirmed, and that the cash payment collected of the purchaser, amounting to $590.20, be paid to T. B. Swann, administrator of Stewart Eagle, after paying all costs of sale and taxes due on the property. This was done and their report of it approved October 19, 1867.

And on the 15th day of April, 1869, the court in the causes of Smith and Hall complainants *v.* The Bank of Virginia *et al.* defendants, W. F. and J. H. Goshorn complainants *v.* The Same *et al.* defendants, Lewis L. Bolling complainant *v.* The Same *et al.* defendants, Samuel J. Cabell's ex'r *v.* The Same *et al.* defendants, and Wm. Dickinson's ex'r *v.* The Same *et al.* defendants which were heard together, rendered a decree. The four last of these causes were the same which had been heard with this cause and others before.

This decree recites, that these causes came on to be heard together on the papers formerly read, and the report of commissioners Gillison and Hedrick, and the exceptions thereto. The exceptions were overruled, the first, second and fourth because there was nothing in the decree, under which the commissioners acted, to sustain them, and no proof was offered to support them; and the third exception, because it was now unmatured. The report was confirmed; and it was decreed that the plaintiffs, Smith and Hall, do retain the said sum of $30,062.91, loaned them for their use, and be discharged from the payment thereof; and by their consent the court adjudged and decreed, that the sums heretofore decreed them and this sum of $30,062.91 with its interest should be a full discharge of all their debts, and their lien on all the assets of the bank was thereby released.

The decree then proceeds to dispose of the sum of $2,564.00, which by the report of the general receiver was in his hands collected of Joel Ruffner; and it orders the same to be paid ratably to the plaintiffs, J. H. and W. F. Goshorn and Lewis L. Bolling, they having served their attachments on this garnishee on the same day. And the decree then proceeds to adjudge, that the plaintiff, William Dickinson's executor, had served his attachment on certain named parties, and by so doing had acquired a lien on certain funds of the bank in a certain suit; and said Dickinson's executor was authorized to collect this fund due the bank, the same when received to

be credited on his claim against the bank. And by consent of the plaintiffs in this cause Levi J. Woodyard's compensation for his care and custody of the papers, money and assets of the Bank of Virginia was fixed at $1,000.00; and it was decreed, that Hall and Smith should pay thereof $700.00, William Dickinson's executor $200.00, J. H. and W. F. Goshorn $80.00 and Samuel J. Cabell's executor $20.00.

It was further adjudged and decreed, that W. E. G. Gillison, as special commissioner, should sell to the highest bidder for cash the iron safe belonging to the Bank of Virginia, on which all the attachments in these causes were levied, after giving ten days' notice of the time, place and terms of sale, and make report thereof; and the commissioner, Burles, should report what parties had recovered judgments for costs against the Bank of Virginia in suits brought against them by Woodyard, receiver, and the amount of these judgments. This decree was entered by the consent of all the plaintiffs in these causes.

On September 6, 1871, the following undertaking for an appeal was filed by the president and directors of the Bank of Virginia:

"STATE OF WEST VIRGINA, KANAWHA COUNTY, ss:

" *Whereas*, In a chancery cause pending in the circuit court of Kanawha county, wherein John Hall and Benjamin H. Smith are complainants, and the president, directors and company of the Bank of Virginia and others are defendants, two decrees have been entered, one on the 18th day of October, 1866, and the other on the 15th day of April, 1869; and, *Whereas*, The said president, directors and company of the Bank of Virginia desire to appeal from said two decrees in the manner prescribed by law; now, *Therefore*, We, W. G. Taylor, principal, and Luther R. Spilman and James H Nash, securities, do undertake, that if the decrees aforesaid are affirmed, the said president, directors and company of the Bank of Virginia will pay to the said Hall

*1878
Special Term.*

Hall *et al.*
v.
The Bank of Va.
*et al.*

and Smith, and to any person injured, all such costs and damages as they or either of them may incur or sustain by reason of such appeal,

"Witness our hands this 6th day of September, 1871.

"WM. G. TAYLOR,
"L. R. SPILMAN,
"JAMES H. NASH."

Notice of this appeal was served promptly on Smith and Hall; but no notice thereof was ever given to any other plaintiffs in these causes, nor have they, or any of them, ever been brought before this court by a summons.

The cause having been docketed in this court on February 4, 1873, the appellees, Hall and Smith, filed the affidavit of said B. H. Smith taken upon notice, which affidavit alleges that the counsel at whose instance this appeal was taken was James H. Nash, that he was employed by Wm. G. Taylor and Luther R. Spilman, who were not parties to the suit and had no authority to take this appeal in the name of the president, directors and company of the Bank of Virginia; that he is informed and believed, that years previously to the taking of this appeal this bank had suspended its operations, that its corporate rights and privileges had ceased and it was an extinct corporation. And upon the motion of said appellees it was ordered, that Wm. G. Taylor, Luther R. Spilman and James H. Nash should be summoned to appear on the three first days of the next term of this court, to be holden at Charleston, and show cause why they should not be required to furnish to this court the authority, under which they institute and prosecute this appeal in the name of the president, directors and company of the Bank of Virginia; and that if they failed to show such legal authority, the appeal should be dismissed at their costs. At the next term of this court at Charleston they tendered their answers.

Taylor's answer states, that by a decree of the Circuit Court of the United States for the eastern district of Virginia in the case of *McIlvane & Co.* v. *Tardy & Saun-*

*ders, trustees and receivers of the Bank of Virginia,* rendered on March 17, 1871, the said Tardy & Saunders were directed to sell at public Auction in the city of Richmond all the effects of the said Bank of Virginia, and that pursuant thereto they on June 29, 1871, did so sell the same, at which sale he, Taylor, on behalf of his firm, Wm. B. Isaacs & Co. (they being creditors of said bank to the amount of $90,000.00) became the purchaser of all the effects of said bank in the branch at Charleston, which sale was confirmed on November 23, 1871, by said court, and a transfer of all such effects was made by Tardy and Saunders, trustees, to Wm. B. Isaacs & Co. This answer was sworn to, and a copy of this assignment filed with it as a part thereof. The assignment is as follows :

"Acting under the decree of the Circuit Court of the United States in the case of S. O. McIlwaine and against us, as receivers of the Bank of Virginia, rendered on the 17th day of March, 1871, and since in pursuance of the authority thereby conferred on us we hereby assign to Messrs. Wm. B. Isaacs & Co., who purchased the same at the sale of the effects of said bank on the 29th of June, 1871, all our right and title, as receivers of the said bank, to the following effects of the same, viz : Charleston Branch, West Va., all the effects of the bank due at or held by or for said branch. No list has been rendered the trustees, and nothing is known of the sum.

"DAVID J. SAUNDERS,
"S. C. TARDY."

Luther R. Spilman and James H. Nash say in their answer, that they acted as counsel in this matter of Wm. B. Isaacs & Co., and they adopt his answer. Spilman further says he acted as the counsel also of the said trustees, Tardy and Saunders.

These answers were excepted to, because not properly authenticated, because the decrees referred to are not filed and because it does not appear when Spilman was employed by the trustees Tardy and Saunders. Leave was given L. R. Spilman to file a separate supplemental

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

answer which he filed April 20, 1874. In his answer, which is sworn to, he states that he was employed by Wm. Isaacs & Co. and by D. J. Saunders and S. C. Tardy, trustees in a deed of trust, a copy of which is filed with this answer. This deed was a conveyance by the president, directors and company of the Bank of Virginia to David J. Saunders and Samuel C. Tardy, trustees. It was made, the deed recites, to prevent a certain creditor of the bank, who had brought a suit, from getting priority over others by obtaining a judgment against the bank; and it was made in pursuance of the provisions of the act of the General Assembly of Virginia, passed February 12, 1866; and it conveyed all the property of the bank, real and personal, including coin, debts, bills, notes, accounts, certificates of debts and choses in action, upon trust to convert the same into money, for which end very ample powers are conferred on these trustees upon trusts to pay the responsibilities of the bank in the manner designated in this deed, and which it is unnecessary to state. The deed is dated February 8, 1867.

The respondent Taylor also filed the affidavit of David J. Saunders, that the assignment filed with the answer of Taylor was made by the trustees on July 7, 1871, and also the report of the sale of the assets of the branch of the Bank of Virginia, at Charleston, which was as shown in said answer and the decree directing said sale dated March 17, 1871, which corresponds with the statements of the answer, and also a copy of the decree confirming the sale, which is dated November 23, 1871. These papers are all formally authenticated, and were filed because of the exceptions to the answers made to the rule.

Writs of certiorari have been issued at the instance of the appellants; and there have been brought up the records in the causes heard with this, that is, the records in the causes of William Dickinson's ex'r v. The Bank of Virginia et al.; Jacob Goshorn and Fayette and Lovel v. The Bank of Virginia el al.; William F. and J. H.

Goshorn *v.* The Bank of Virginia *et al.*; Lewis L. Bolling *v.* The Bank of Virginia *et al.*; Samuel J. Cabell *v.* The Bank of Virginia *et al.*; Jessie Timms *v.* The Bank of Virginia *et al.*, and Stewart Eagles' adm'r *v.* The Bank of Virginia *et al.*

On the 20th of August, 1878, this cause was submitted to this court for decision on said rule and upon the merits of the cause.

*W. W. Gordon, L. R. Spilman,* and *Mollohan & Nash,* for appellants, cited the following authorities:

18 Gratt. 842; 7 Leigh 313; 4 Rand. 78; 4 W. Va. 305; 18 Johns. 341; Drake Attach., §230 and n. and cases cited; *Id.*, §292; *Id.*, §91; *Id.*, §238; 10 Gratt. 288; 6 Gratt. 96; 3 Call 455; 3 Munf. 94; 2 Rob. 258; 2 Wash. 191; 9 Gratt. 386; 12 Leigh 204; 2 Leigh 6; 14 Law. Rep. E. C. 202; 8 Pet. 123; 19 Johns. 233; 8 Cow. 168; 6 Wend. 263; 9 Wall. 72; 6 Wall. 521; Code 1860, ch. 58, §§17, 27; Acts 1831–2, p. 68; 2 Rev. Code (1816), p. 117; 12 Pet. 328; 11 How. 44; 17 U. S. Stat. 197; 92 U. S. S. 516; 91 U. S. S. 130; 19 Gratt. 545; Story Confl. Laws, §409; *Id.* §§ 403–420; 4 Johns. Ch. 460; 1 Seld. 820; 7 Mich. 36; Story Confl. Laws, §411; 18 Gratt. 513; 3 W. Va. 309; 9 W. Va. 424; Code Va. 1860, ch. 188, §6; Code W. Va., ch. 141, §5; Stat. Mass. 1860, ch. 118, §70; Story Eq. Jur., §§1291, 1293, 1294, 1297; 45 N. Y. 86; 16 Wall. 622; 111 Mass. 202, 209; Code W. Va., ch. 53, §59; Code Va.; ch. 56, §30; 6 Gratt. 363; 21 Gratt. 636; 10 W. Va. 59; 3 W. Va. 309; 4 W. Va. 305; 7 W. Va. 31, 42; 4 W. Va. 648; 12 Gratt. 655; Cons., Art. XI., §8; 2 W. Va. 73; 1 W. Va. 308; Code Va. 1860, ch. 170, §7; 27 Gratt. 216; 28 Gratt. 630, 642, 643; 12 U. S. R. S. 247; 2 Black 687; 2 Wall. 258, 274; *Id.* 404, 419; 6 Wall. 114; *Id.* 521, 530, 531; *Id.* 532, 535; 7 Wall. 542, 554; 8 Wall. 163, 166; 9 Wall. 72; Story Eq. Pl. (8th ed.) §399; 7 Wall. 211; Story Eq. Pl. §§853, 854, n. 5; 19 Gratt. 432; *Id.* 21; 27 Gratt. 631; 18 Gratt. 83; Powell App. Pro. 104;

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

*Id.* 158; *Id.* 178; 19 Gratt. 427; 29 Gratt. 546; 19 Gratt. 750; 19 Gratt. 13; 11 Wall. 267; 23 Gratt. 409; 18 Gratt. 515; 8 Law Rep. Eq. 77; Story Confl. Laws, §§362, 383, 389; Powell App. Pro. 288; 4 Ohio 374; 6 Ohio 379; 23 Wall. 162; 6 Gratt. 363, 371; 21 Gratt. 650.

*William A. Quarrier,* for appellees, cited the following authorities:

4 Rand. 386; 4 W. Va. 493; 7 Pet. 402; 1 Abb. U. S. Dig. Appeal 407, Nos. 2391, 2397; Code, ch. 135, §§ 4, 5; 11 How. 44; 12 Pet. 328; 3 Am. Rep. 104; 10 How. 68; 3 Wall. 341; 6 Wall. 166; 10 Pet. 400; 3 Am. Rep. 85; 6 Hill 415; Code Va. ch. 57, §35; *Id.* ch. 58, §53; Ang. and Ames. Corp. §779; Code Va. ch. 52, §17; *Id.* ch. 53, §59; 3 W. Va. 309; Code Va. 1860, ch. 171, §19; Code, ch. 106, §19; 4 W. Va. 305; *Id.* 648; Cons. Art. XI, §8; 11 Leigh 372; 11 Pet. 588; Code Va. 1860, ch. 151, §§7, 8.

GREEN, PRESIDENT, delivered the opinion of the Court:

Before considering this case on its merits the preliminary question, whether this appeal should be dismissed, must first be disposed of. If the title to the assets of the Bank of Virginia in litigation has been validly passed to Wm. B. Isaacs & Co., then, as the assignees of the bank *pendite lite,* they would have a right to prosecute this appeal in the name of the bank. It is admitted that this would be the case, if the corporate rights of the Bank of Virginia had not ceased; but it is insisted that at common law upon the dissolution of a corporation in any manner all suits pending for or against it abate, and that they can be continued only by virtue of, and in the manner prescribed by the 54th section of chapter 53, page 403 of our Code; and it is claimed that by this statute this can only be done under the order and direction of the board of directors in office at the dissolution of the cor-

poration, or that of the receiver appointed by the circuit court.

It is true, that the property and assets of a dissolved corporation are put under such direction and order ; but this section further provides, that suits may be brought, continued or defended in the corporate name; in like manner and with like effect as before the dissolution of the corporation. If then the assignee of the corporation *pendite lite* could without an order of the board of directors, or without their consent, defend a suit already brought before the dissolution of a corporation, under the express terms of this statute they may in like manner do so in the corporate name after the dissolution of the corporation.

Are Wm. B. Isaacs & Co. the assignees of the assets of the Bank of Virginia in litigation in this suit? Was the assignment made by David J. Saunders and S. C. Tardy, trustees and receivers, to Wm. B. Isaacs & Co. on July 7, 1871, of all the effects of the Bank of Virginia, at Charleston, and of the effects of the bank at Charleston held by the branch of said bank at Charleston or held for said branch, valid and legally effective ?

The terms of this assignment are sufficiently comprehensive to convey the assets in litigation in this suit ; for if the attachment in this suit is invalid, they were assets held for the said branch of said bank at Charleston. This assignment was made in strict conformity to a decree of the Circuit Court of the United States for the eastern district of Virginia in the suit of Samuel O. McIlwaine *v.* Saunders and Tardy, trustees of the Bank of Virginia, entered March 17, 1871, and was approved and confirmed by said court by its decree in said cause made November 23, 1871. As the assets of the Bank of Virginia, which were disposed of by the circuit court for the benefit of the plaintiffs Hall and Smith, were personal assets only and under the decree of that court of April 15, 1869, appealed from, any claim or lien, which they had upon the real estate of the Bank of Virginia or its pro-

1878
Special Term.
───────────
Hall et al.
v.
The Bank of Va.
et al,

ceeds, is released and destroyed, the only question we need investigate is, whether Wm. B. Isaacs & Co. had a valid claim to the personal property, that is, the choses in action of the Bank of Virginia at its Charleston branch.

On the question as to the effect of assignments of personal property or choses in action in one State or country not by the owner, but by operation of law, or by a decree of a court in another State or country, there has been much conflict of opinion. Thus in England it is now settled, that an assignment under the bankrupt law of a foreign country passes all debts due the bankrupt from persons residing in England, and that after such assignment by operation of the law of a foreign country no creditor of the bankrupt could attach such English debts. The laws of Holland and France coincide with the English decisions on this point. See Story's Conflict of Laws, §§409, 417, pp. 682, 688. These positions are also sustained by considerable weight of American authority and by eminent American jurists, as by Chief Justice Parsons in *Goodwin* v. *Jones*, 3 Mass. 517, and Chancellor Kent in *Holmes* v. *Remson,* 4 John Ch 460. But the weight of American authorities is, that the voluntary assignment of a party according to the law of his domicile will pass his personal estate or choses in action whatever be its locality, but an involuntary assignment operating by the mere authority of law does not operate like a voluntary assignment, but it operates only to the extent of placing the assignee in the same situation as the bankrupt himself in regard to foreign debts, and they take them subject to equities belonging to foreign creditors and subject to the remedies provided by the laws of foreign countries, where the debt is due. See Story's Conflict of Laws §412, p 685.

If we were to admit the correctness of these American cases it would not affect the rights of Wm. B. Isaacs & Co. to the personal assets of the Bank of Virginia at its Charleston branch. The assignment to them, whether we regard it

as a voluntary assignment of the trustees, Saunders and Tardy, or as an involuntary assignment by mere authority of law, in either case by all the authorities would transfer such personal assets though located in a different State, subject of course to any valid attachment which existed at the time of such voluntary or involuntary assignment. If it were regarded as an involuntary assignment by mere authority of law, it might perhaps by the American authorities give a right to the creditors of the Bank of Virginia, after the date of such assignment, by proper legal proceeding to acquire a lien on such assets in this State, which lien might be regarded as valid against such involuntary assignment. But no such case is presented by this record. It is not contended by the appellants' counsel that this assignment, whether regarded as voluntary or involuntary, has any effect as against the appellees', Hall and Smith's, attachment, but only that if this be void, then their claim is valid. As against the Bank of Virginia, the assignment to them, though it were regarded as involuntary and by mere operation of law, would be valid; and that this is all that is necessary to entitle them to prosecute this appeal. All they ask is, to be put by this assignment in the situation of the bank itself, subject to every equity belonging to the creditors of the Bank of Virginia in West Virginia. This right at least, all the authorities admit, this assignment though involuntary would confer on them; and it is all that is necessary to give them a right to prosecute this appeal.

But in truth the assignment, under which they claim, is voluntary. The deed of all its assets, made by the Bank of Virginia to D. J. Saunders and S. C. Tardy, as trustees, on February 8, 1867, recites as a reason for its being made, that a creditor of the bank had brought a suit, and the judgment in this suit would give this creditor priority over other creditors, to prevent which the deed was made. It is true it also recites, that it was made pursuant to the act of the Commonwealth of Vir-

ginia, passed the 12th day of February, 1866, entitled "an act requiring the Banks of the Commonwealth to go into liquidation." But the act itself had no provision in it compelling the Bank of Virginia to make such a deed; and it could have executed such a deed, had no such act passed. It could not then have the effect of making this deed involuntary.

Judge Joynes, speaking of this act in the case of *Robinson* v. *Gardiner*, 18 Gratt. 513, says: "The events of the late war reduced all the banks of circulation in the State to a condition of utter and hopeless insolvency. They suspended business from necessity, and there was no possibility of resumption. It only remained to wind them up, and to distribute among their creditors such remnants of their assets as might be realized. In this condition of things and to accomplish this object effectually, the act of February 12, 1866, was passed. It proceeded upon the assumption, that the banks were already in the course of liquidation, forced upon them by the calamities of the war; and its purpose was to provide regulations by which, as recited in the preamble, a speedy settlement of the affairs of said banks should be made, in order to a legal and proper distribution of their assets among all persons entitled to share in such distribution."

Upon this question, whether a deed made under this act was voluntary or not, Judge Edmiston, in delivering the opinion of the court in *Harrison's ex'r* v. *Farmers' Bank of Virginia*, 9 W. Va., says: "It is said that these assets were in another State, and were under the control of a court to charge them, or so much as was necessary to pay debts set up in the suit. This is all true; but can it be claimed that a deed cannot operate for any such reason? I think not. But it is further said, that this was not a voluntary conveyance, and for that reason it cannot operate outside the limits of the State in which it was made. I do not see how it can be called an involuntary conveyance. The directors of the bank had a

right, at any time the exigencies of the corporation required, to make a conveyance in trust to secure its creditors, independent of the act of the Legislature, under which this deed purports to have been made. The act of the Legislature did not and could not compel the bank to convey ; it only had the effect to express the views of the General Assembly of Virginia, that it ought to be done, and to yield the State's consent to that effect, so far as she had her interest in said bank. No proceedings were ordered to be had against the bank, if it failed, nor anything that looked like compelling, or seeking to compel the execution of such a deed. It therefore has to my mind every characteristic of a free and voluntary act on the part of the directors of said bank."

The same views were held in the case of *The Bank of the Valley* v. *Gettinger,* 3 W. Va. 309.

As Spilman in his answer claims to be acting under this voluntary deed, his right to prosecute this appeal can not be controverted. These trustees were appointed by the decree of the United States District Court in the case of *McIlvaine* v. *Thorn,* to dispose of the assets conveyed to them by this deed, that the sum might be applied by the court as directed by this deed. They had the same power under this deed to dispose of these assets in like manner. Their disposition and assignment of it under this decree can not, it seems. to me, be regarded as an assignment by mere authority of law, but must have the same effect as a voluntary assignment. But whether regarded as voluntary or involuntary, so far as the prosecution of this appeal is concerned, is immaterial, as we have before shown.

The rule against the attorneys in this case must therefore be discharged.

It is in argument assigned as an error, that as the plaintiffs did not execute the bond required by the 8th section of chapter 151, page 647 of Code of 1860, the direction to the sheriff to attach the estate of the defendant was unauthorized, and the levy of the same was

77

illegal and void; and such levy was also void, because the sheriff did not retain possession of the property.

This was an attachment in equity under the 11th section of chapter 151 of Code of 1860, page 648; and the requirements of that section were strictly pursued, and the attachment therefore legally sued out. It was served in strict accordance with the 7th section of said act, page 647. Possession of the property was not taken by the sheriff; but his levy on it was simply by notifying those who held it by leaving a copy of the attachment with them as required by this 7th section. He would have committed a wrong, had he taken possession of the property, as no bond was given. Such possession could only be taken by him, when a bond was given, as provided in the 8th section, page 647.

It is alleged as another error, that the bill is defective in not stating the amount of the plaintiffs' claim. This did not affect the validity of the attachment, as the amount of the plaintiffs' demand was stated in the affidavit filed, when the attachment was sued out, and also in the amended bill. Even if the amount had not been stated in the affidavit, or even if no affidavit had been filed when the attachment issued, under the laws and practice, which prevailed in Virginia, this would not have rendered the attachment void. See *Moore et al.* v. *Holt*, 10 Gratt. 287. The amount of the plaintiffs' demand is in effect set forth in the original bill in this case, as the claim is stated to be for bank notes issued by the Bank of Virginia, and which notes are made expressly by the bill a part thereof. They are not copied into the record as it has been brought up by appellants, simply, I suppose, because of the large space it would take and of the useless trouble it would have required to copy bank notes amounting to $36,500.00. The amount, which these notes filed with the bill aggregated, was stated in the affidavit filed when the suit was instituted. It was never controverted in the circuit court by any of the parties, and not denied or questioned by the appellants

in their answer; and they have failed to have them copied into the record, though they constituted a part of it. Under these circumstances we are justified in assuming that the circuit court, who had the means of so doing, ascertained correctly the amount of these notes.

It is also objected by the appellants' counsel that the description of the lot of the Bank of Virginia attached is insufficient to identify it. There is nothing in this objection. The return on the attachment is, "levied on the lot of said Bank of Virginia and vault thereon in Charleston, West Virginia, and in the endorsement on the process described." This endorsement describes it as "the lot and vault thereon in the town of Charleston in the bill mentioned;" and it is minutely described in the bill; and the Bank of Virginia expressly consented to the portion of the decree directing the sale of this lot. The description of the real estate levied on by an attachment need not be as particular as in the levy of an execution on land. See Drake on Attachments §237. Any words, which clearly designate and comprehend the property, are sufficient. Thus it has been held that a return of an attachment of all the defendant's interest "in a certain parcel of land on Pleasant street in Boston" will suffice, if he was interested in but one parcel of land on that street. *Whitaker* v. *Sumner,* 9 Pick. 308. So a return that the officer "had attached the homestead farm of the defendants containing thirty acres more or less," though the farm in fact contained one hundred and fifty acres. See *Bacon* v. *Leonard,* 4 Pick. 277. So the return of an attachment of the defendants's interest in the farm he lives on is sufficient. *Howard* v. *Daniels,* 2 N. H. 137. There can be no question that the return in the present case was sufficiently definite.

Again it is objected by the appellants' counsel, that the case was prematurely set for hearing. The cause was not heard till more than ten months after the summons had been served on all the home defendants and

order of publication duly made and executed on all the non-resident defendants; and when heard, it was heard on the answer of the appellants, which had been filed more than six months before, and at once replied to generally. When heard, the appellants appeared and consented to a portion of the decree then entered. Under such circumstances such objection can not avail. Judge Samuels in delivering the opinion of the court in *Poling* v. *Johnson*, 2 Rob. 258, says in speaking of an irregularity at rules in prematurely settling a cause for hearing: "Had the record distinctly shown that the defendants appeared at the hearing in person or by counsel, the court might properly imply, that as no objection appears in the record to have been taken to said irregularity at rules, the objection thereto was waived and the cause heard by consent, though such consent was not expressly stated on the record."

It is also urged, that it was irregular to sell the land before bond was given or the personal property levied on had been disposed of by the court. It is a sufficient answer to this objection, that the appellant, the owner of the land, expressly consented to this sale, when the order of sale was made.

It is urged too, that as several creditors can not join in the same attachment, but must each file a separate bill, the bill and proceedings were fatally defective, because the suit was instituted by two creditors, Hall and Smith. The plaintiffs in their bill alleged that the president, directors and company of the Bank of Virginia was indebted to them for divers promissory notes, &c. This is an allegation, that the defendants owned jointly these notes, and that the appellants owed them jointly; and of course the suit could only be properly brought by them jointly.

The demurrer filed by James W. Hoge, administrator, &c., was not acted upon; but as it could not have been sustained, the appellants are not injured by this omission.

Again it is objected, that the petition of the State of West Virginia states, that these notes were acquired by unlawful communication with the public enemy, and this was not denied and must therefore be held to be true. The State of West Virginia was not a defendant to this suit; and its petition to be made such ought to have been rejected. The only interest claimed by it in the controversy was, that it was a stockholder in the Bank of Virginia. If it had a right to be made a defendant, every other stockholder could have claimed the same right. There was then no necessity or propriety in permitting this petition to be filed; and it was properly not replied to. The facts alleged in it were not proven and can not be regarded as true. But it is said that the same allegations were made in the petition of J. H. & W. F. Goshorn, who had a right to be defendants in this cause, and they asked that their petition might be regarded as an answer and cross-bill; and these facts alleged being fatal to the plaintiffs' claim, and not being denied, ought to be taken to be true, or that these defendants should have been allowed time to prove them. To this it is a sufficient answer to state, that J. H. & W. F. Goshorn expressly, by their counsel, assent to the entering of the two decrees which have been appealed from.

It is urged by the appellees' counsel, that a joint judgment or decree cannot be reversed as to some of the parties and affirmed as to others. See *Jones* v. *Raine*, 4 Rand, 386; *Vandiver* v. *Roberts*, 4 W. Va. 493; *Owings* v. *Kincannon.* 7 Pet, 402. It is urged that these decisions are based on a judgment or decree being an entirety, and that the appellants having appealed in this case from two decrees in the case of *Hall and Smith* v. *Thorn et al.*, and it appearing to the court that these decrees complained of were rendered in this case and a number of others, in which other parties were plaintiffs who are not before this court, we cannot reverse these decrees as to these plaintiffs not before the court, and therefore cannot re-

verse them as to Hall and Smith, but must without regard to the merits affirm these decrees as to all parties; and that this being the case through the failure of the appellants to appeal in all the causes in which these decrees were rendered, the court should dismiss their appeal as improperly taken. To this the appellants' counsel replies, that if the cases are not so connected as to render it necessary that an appeal should be taken in all, there is no error in this respect; and if they are so connected, then an appeal in one brings up all the others. See *Anderson*, v. *De Soer*, 6 Gratt. 363; *Walker's ex'r.* v. *Page*, 21 Gratt. 636; *Hill* v. *Proctor*, 10 W. Va. 73–75.

It seems to me, that there is no such connection between this cause and the others with which it was heard, as renders it improper to take an appeal in this case alone. This was not a case in which the various plaintiffs had a joint interest, and in which therefore a decree or judgment could not be affirmed as to one and reversed as to another, as were all the cases referred to by the appellee's counsel; nor is it a case where the interests of the plaintiffs or other parties are so intermingled that one case can not be justly reviewed without at the same time reviewing the others, as were all the cases referred to by the appellants' counsel. But on the contrary, while the cases were heard together simply because the same funds were to some extent attached in them, yet there appears on the very face of the decrees appealed from, that there was no sort of conflict or dispute between the plaintiffs in the various suits, while their interests were separate, thus distinguishing this from the cases referred to by the appellees' counsel. There were at the same time neither conflict among them nor such a commingling of interests as to make it necessary to review all of them in order to do justice in reviewing one, as was the case in the different cases referred to by the appellants' counsel. So entirely independent of each other are the interests of the plaintiffs in these cases, and at the same time so entirely free were they from all conflict of interest, that both of

1878
Special Term.

Hall et al.
v.
The Bank of Va.
et al.

the decrees complained of were assented to by the counsel of the plaintiffs in all these causes. It was therefore perfectly competent and proper for the appellants to appeal from these decrees in one of these causes only; and this they have done. Appealing, as they properly did, in one of these causes only we do not think they committed an error in their undertaking to describe the appeals as rendered in one of the causes. These decrees might have been more accurately described in the undertaking, and at the same time the undertaking might have shown it was intended to appeal but in the one cause. But as it is, there can be no difficulty in identifying the decrees from which appeals were taken, and the form of the undertaking at the same time shows that an appeal was taken only in the case of Hall and Smith against the appellants and others. This was further shown by the fact that notice of such appeal was given to no one but Hall and Smith. The plaintiffs in all the other suits named in the decrees appealed from have had no notice of such appeals to this day; the appellants have not asked to have them summoned by an order of this court; and had they done so, this court could not have made such an order; and yet the appellants on the writs of *certiorari*, which they have obtained, have brought up the full records in all these causes which were heard together in the decrees appealed from. We could not as a matter of course consider these causes or reverse these decrees as to any of these plaintiffs other than Smith and Hall; and these various records are not regarded as forming any part of the record in the case before us, or as necessary to the full understanding of the merits of the case before us, so far as it is proper for us to consider and act upon it on this appeal.

It is also urged by appellants' counsel, that one of the decrees appealed from was rendered by James W. Hoge as the circuit judge, and that he was a party to the suit and filed an answer as administrator of John G. Wright in the cause; and that the judge, who decided the cause,

being interested in the cause, this alone was a sufficient reason for setting it aside, see *Mc Veigh* v. *United States*, 11 Wall. 267. The record shows that James W. Hoge was not the judge who rendered the decree of the 18th day of October, 1866, which settled the principles of this cause and is one of the decrees appealed from. The other decree appealed from of date April 15, 1869, simply executes and carries into effect the former decree settling the principles of the cause. Neither decree in any manner promotes the interest of James W. Hoge as administrator of John G. Wright or individually, but on the contrary they seem to be adverse to his interest. The record presented to this court by the appellants fails to show what judge entered this last decree. But even had it been shown by the record that it was entered by Judge James W. Hoge, in the absence of all evidence and of any objection in the court below we could not presume that the judge was the same person as the administrator of John G. Wright, who was a party to the suit, merely because they bore the same name. Such a presumption might be proper in many cases; but it would not be proper, when it is made to charge a judge with impropriety of conduct and to set aside a decree of a court.

*W. S. Coleman* v. *James T. Waters, et al.*, 13 W. Va. 278, was a case, where a judgment was confessed in New Jersey by an attorney, John C. Ten Eyck, before a commissioner named John C. Ten Eyck; and this judgment was sought to be enforced here; and it was assailed, because the attorney, who confessed the judgment against the defendant, was the same person as the commissioner who entered up the judgment. There was no other evidence to show that the attorney and commissioner were the same person, except their identity of names. This Court affirmed a decree enforcing this judgment as valid and binding. In delivering the opinion of the Court Judge Haymond says: "But it is maintained by appellants, that the judgment is null, because the person, to whom the warrant of attorney is directed, and the Su-

1878
Special Term.

Hall *et al.*
v.
The Bank of Va.
*et al.*

preme Court commissioner, before whom the confession of judgment was had, are one and the same person, and that the attorney could not confess judgment to himself as commissioner. However this may be in law, there is no evidence appearing by the record that the commissioner and the attorney, to whom the warrant of attorney is directed, are one and the same person, and I do not feel authorized, in the absence of proof, to presume that the attorney and commissioner were or are one and the same person, from the fact that they were or are of the same name, in order to set aside what purports to be a solemn judgment of a court of competent jurisdiction of a sister State. In the absence of proof to the contrary, if any presumption can or should be drawn, it must be in favor of the judgment, and that the attorney and commissioner were not and are not one and the same person." There is therefore nothing in this alleged error.

We have disposed of all the questions which have been raised with reference to the regularity of the proceedings in this cause. It remains to dispose of two questions which affect the merits of the cause. The first of these questions is: Did the circuit court have any jurisdiction of this cause? This depends entirely on the question, whether the Bank of Virginia was, when the attachment issued in this cause on November the 30th, 1864, a non-resident of the State of West Virginia. The counsel for the appellees insist that this question can not be considered by this court, as the Bank of Virginia could not raise such question except by a plea in abatement under the 19th section of chapter 171, page 711, of Code of Virginia of 1860. And they rely on the case of the *Bank of the Valley* v. *Gettinger*, 3 W. Va. 314, as sustaining this view.

That case differs from this in one important particular; there, when the .appeal was taken, the Bank of the Valley having appeared, there had been a judgment rendered against it, but the court had rendered no judgment disposing of the attached effects ; in the cause before

us a decree has been rendered disposing of the attached effects. This court held in that case, the bank having appeared and there having been rendered against it nothing but a personal judgment, that the questions of jurisdiction in the cause could not be raised in this court, there having been no plea to the jurisdiction of the court filed, and the declaration showing on its face proper matter for the jurisdiction of the court. But they considered and decided the question because, they said, that as the assignee of the bank had filed a petition setting up the assignment of all the property attached, before the court could dispose of the property, the validity of this assignment would have to be decided, and if valid, the court could not dispose of the property under the attachment, though the personal judgment must stand. The court then, after the Bank of Virginia in this cause had filed an answer, had jurisdiction to render a personal decree against it; but if the Bank of Virginia was not a non-resident of this State, the court erred on the merits of this cause in adjudging as it did by the decree of October 18, 1866, appealed from, that said bank was a non-resident corporation, and that the attachment of the complainants was valid and binding, and ordering a sale of the attached effects; and in its subsequent decree also appealed from, ordering the payment of the complainants' debt out of the proceeds of the sale of their attached effects.

We must therefore enquire, whether the complainant's attachment was valid, and whether the Bank of Virginia was a non-resident of this State on November 30, 1864, when the attachment was issued.

The question, what is the residence of a corporation? has been very often discussed in the Supreme Court of the United States. The Constitution of the United States provides "that the judicial power of the United States shall extend to *controversies* between *citizens* of different States." Under this provision of the Constitution it was at first seriously questioned, whether a corporation could

in any case either sue or be sued in the courts of the United States. It was contended that the word citizen had a well-known signification and meant a natural person, either native or naturalized. And that as a corporation could not be a citizen of a State, it could not either sue or be sued in the courts of the United States. It was also contended, that as by this provision of the Constitution residence in different States was required, as a corporation is a mere creation of the mind invisible and intangible, it can have no residence and cannot therefore sue or be sued in the United States courts, whose jurisdiction depends on the residence of the parties. These views were entertained by Justice Daniel and are stated at large in his dissenting opinion in the case of *Rundal et al* v. *Delaware and Raritan Canal Co.*, 14 How. 95. These positions were answered by saying, that where a corporation was sued, the *controversy* as distinguished from the suit was between the plaintiff and the individual members of the corporation, and if the plaintiff was a citizen of one State and all the individual members of the corporation of the United States were citizens of another State, the United States courts would under the Constitution have jurisdiction of the cause, though the defendant, itself a corporation, could not be a citizen or have a residence. These were the views of the Supreme Court as laid down in the *Bank of the United States* v. *Deveaux et al.*, decided in 1809. See 5 Cranch 61.

It had been previously decided by the Supreme Court in *Strawbridge et al.* v. *Curtis et al.*, that if there be two or more joint plaintiffs and two or more joint defendants, each of the plaintiffs must by virtue of their residence be capable of suing each of the defendants by virtue of their residence. See *Strawbridge et al.* v. *Curtis et al.*, 3 Cranch 267. But the principles laid down in these cases were not followed in the case of *The Bank of the U. S.* v. *Planters' Bank*, decided in 1824, see 9 Wheat. 904, where it was held in a suit by one corporation against another, that the fact that some of the stock-

holders in the plaintiff corporation were citizens of the same State with some of the stockholders of the defendant corporation, would not prevent the courts of the United States from having jurisdiction. But subsequently the court laid down again, and followed out in its decision, the doctrines laid down in these two cases in Cranch's Reports; and in the *Commercial Bank of Vicksburg* v. *Slocomb et al.*, decided in 1840, 14 Pet. 60, held that an artificial person being a corporation aggregate is not as such a citizen of the United States, but the court will look beyond the mere corporate character to the individuals of which it is composed, and if they were citizens of a different State from the party sued, they are competent to sue in the United States courts; but all the corporators must be citizens of different States from the party sued. And the same they held applicable when a corporation was a defendant.

It is obvious that under such a decision as this but few of the great corporations of this day could either sue or be sued in the courts of the United States. But this decision was maintained as law but a brief time; for in the case of *Louisville Railroad Company* v. *Letson*, 2 How. 555, decided in 1844, the court say: "After mature deliberation we feel free to say that the cases of *Strawbridge and Curtis* and the *Bank and Deveaux*, were carried too far; and that consequences and inferences have been argumentively drawn from the reasoning employed in the latter, which ought not to be followed. Indeed it is difficult not to feel that the case of *The Bank of the United States* and the *Planters' Bank of Georgia* is founded upon principles irreconcilable with some of those on which the cases already adverted to were founded. The case of the *Commercial Bank of Vicksburg and Slocomb* was most reluctantly decided upon the mere authority of those cases. We do not think that either of them is maintainable upon the true principles of interpretation of the Constitution and laws of the United States. A corporation created

by a State to perform its functions under the authority
of that State and only suable there, though it may have
its members out of the State, seems, to us to be a
person, though an artificial one, inhabiting and belong-
ing to that State, and therefore entitled, for the purposes
of suing and being sued, to be deemed a citizen of that
State."

In these views the whole court concurred and the
case of the *Bank* v. *Deveaux*, 5 Cranch 84, was overruled.
The decision of the court was that a corporation was a
resident of the State by which it was incorporated, no
matter where its stockholders resided.   And it was ac-
cordingly held in the case of *Marshall* v. *Baltimore and
Ohio Railroad Company*, 16 How. 314, that a citizen of
Virginia may sue the Baltimore and Ohio Railroad
Company in the Circuit Court of the United States for
Maryland; and an averment, that the defendants are a
body corporate created by the Legislature of Maryland,
is sufficient to give the court jurisdiction.   But Justices
Campbell and Catson dissented, holding that this aver-
ment was insufficient to give the court jurisdiction.
The views of the majority of the court in this case were
re-affirmed in the case of the *Covington Drawbridge Co.*
v. *Shepard et al*, 20 How. 227.   Justices Campbell and
Daniel dissenting; and the same decision was rendered
in the *Philadelphia, Wilmington and Baltimore Railroad
Company* v. *Quigley*, 21 How. 202.

The positon first taken by the court, that the residence
of a corporation depended upon the residence of its
stockholders, gave rise to the difficulty of determining
where its residence was, when the stockholders resided
in different States.   This difficulty was, as we have seen,
finally solved by holding that the residence of a corpor-
ation was the State by which it was incorporated, with-
out any reference to the residence of its stockholders.
This being determined, the next difficulty was to deter-
mine where was the residence of a corporation, when a
charter of incorporation had been granted to it by more

than one State.    It had been said by the court in the *Bank of Augusta* v. *Earle*, 13 Pet. 588, that a corporation "must dwell in the place of its creation and cannot migrate to another sovereignty."  And in *Runyan* v. *Lessee of Coster*, 14 Pet. 129, it was said:  "A corporation can have no legal existence out of the sovereignty by which it was created."

In the case of *The Ohio and Mississippi Railroad Company* v. *Wheeler*, 1 Black 286, the suit was brought by the corporation in the Circuit Court of the United States for the District of Indiana to recover of the defendant, a citizen of Indiana, a subscription to the stock of the company.  The declaration stated, that the plaintiff was a corporation created by the laws of the States of Indiana and Ohio having its principal place of business in Cincinnati; that the plaintiff is a citizen of the State of Ohio and the defendant is a citizen of the State of Indiana."  The defendant pleaded to the jurisdiction, that he was a citizen of the State of Indiana, and the plaintiffs were a body politic and corporate created, organized and existing in the same State under and by virtue of an act of Assembly of the State. The plaintiffs demurred to this plea.  The court decided that the United States Court could have no jurisdiction in such a case.  They based their opinion on the ground that a suit in the corporate name is in contemplation of law a suit by the individuals who compose it, who are conclusively presumed to be citizens of the State which granted the charter of corporation, and therefore by this declaration the plaintiffs are alleged to be citizens of Ohio and Indiana, and citizens of these States could not join in an action against a citizen of one of them in a United States Court.

Chief Justice Taney, in delivering the opinion of the court further says:  "The averments in the declaration would seem to imply that the plaintiffs claim to have been created a corporate body, and to have been endowed with the capacities and facilities it possesses by the co-op-

erating legislation of the two States, and to be one and the same legal being in both States. If this was the case, it would not affect the question of jurisdiction in this suit." He then proceeds to show, that on the authority of the *Bank of Augusta* v. *Earle* 13 Pet. 588, this could not be so. And he goes on to say that a corporation, which has obtained a charter from two States conferring on it the same capacities and powers, is really one body in one State and a separate and distinct corporate body in the other, and they could not join in a suit as one and the same plaintiff, or maintain a suit in the United States courts against a citizen of the United States.

This court subsequently, while it approved this decision overruled these views in the case of the *Railroad Company* v. *Harris,* 12 Wall. 82, say: "We see no reason why several States cannot by competent legislation unite in creating the same corporation, or in combining several pre-existing corporations into a single one.

The Philadelphia, Wilmington and Baltimore Railroad Company is one of the latter description; and its valid existence as such is assumed by Chief Justice Taney in the suit of that *Company* v. *Maryland,* 10 How. 392. The jurisdictional effect of such a corporation, as regards the Federal Courts, is the same as that of a co-partnership of individual citizens residing in different States. Nor do we see any reason why one State may not make a corporation of another State, as then organized and conducted, a corporation of its own *quoad hoc* any property within its territorial jurisdiction. That this may be done was distinctly held in *The Ohio and Mississippi Railroad Co* v. *Wheeler,* 1 Black. 297. It is well settled that a corporation of one State may exercise its faculties in another, under such terms and to such extent as may be permitted by the latter. See *Blackstone Manufacturing Co.* v. *The Inhabitants, &c.* 13 Gray 489; *Bank of Augusta* v. *Earle,* 13 Pet. 588.

We hold the case before us is within this latter category. The question is always one of legislative intent

and not of legislative power or legal possibility. So far as there is anything in the language of the court in the case of *The Ohio & Mississippi Railroad Co.* v. *Wheeler* in conflict with what has been here said, it is intended to be restrained and qualified by this opinion. We will add however, as the case appears in the reports, we think the judgment of the court was correctly given. It was the case of an Indiana railroad company licensed by Ohio suing a citizen of Indiana in the Federal court of that State.

In *The Baltimore and Ohio Railroad Co.* v. *Gallahue's adm'r.*, 12 Gratt. 658, it was held by the Court of Appeals of Virginia that the company was suable in that State. In this we concur. We think this condition is clearly implied in the license, and that the company by constructing its road there assented to it. The authority of that case was recognized by the Court of Appeals of West Virginia in *Goshorn* v. *The Supervisors*, 1 W. Va. 308, and in *The Balt. & Ohio Railroad Co.* v. *The Supervisors et al.*, 3 W. Va. 319. Here the question is whether that company is suable in the District of Columbia.

The court discuss this question and decide that it is suable in the District of Columbia. The suit was for an injury done the plaintiff at Mannington, Virginia. The company pleaded in abatement that it was not an inhabitant of the District of Columbia when the writ was served, and secondly, that the company was not found in the District of Columbia when the writ was served. Harris, the plaintiff, replied to the first plea, that the company was an inhabitant of the District of Columbia by virtue of the act of Congress of date March 2, 1831, entitled "an act to authorize the extension, construction, and use of a lateral branch of the Baltimore & Ohio railroad into and within the District of Columbia;" that they had accepted its provisions, and constructed their roads under the act, availing themselves of the provisions thus conferred and doing business under it in the District of Columbia. To the second plea Harris

replied, "that the company was found within the District of Columbia when the writ was served by virtue of this act of Congress, and due and legal service of the process was made on the person of the president within the District." The defendant demurred to these replications, and the demurrer was overruled. The Supreme Court affirmed this decision.

In the case of *The Railroad Company* v. *Whitton's adm'r*, 13 Wall. 270, it was decided, that for the purpose of giving jurisdiction to the courts of the United States a corporation will be considered as a citizen of the State by which it was incorporated first, though it has been incorporated since in other States; but in suits instituted in the courts of such States it must be regarded as a citizen of the State in which the suit is brought and of no other State. The defendant in that case was the Chicago and Northwestern Railway Company, first chartered by the State of Wisconsin and afterwards by the States of Michigan and Illinois severally. Its principal office was at Chicago, Illinois. The plaintiff was a citizen of Illinois. It was held, that the United States Circuit Court of Wisconsin has jurisdiction of the case.

The court say : "The plaintiff is a citizen of the State of Illinois, and the defendant is a corporation created under the laws of Wisconsin. Although a corporation, being an artificial body created by legislative power, is not a citizen within several provisions of the constitution, yet it has been held, and that must now be regarded as settled law, that where rights of action are to be enforced, it will be considered as a citizen of the State where it was created, within the clause extending the judicial power of the United States to controversies between citizens of different States. See *Paul* v. *Virginia*, 8 Wall. 177. The defendant therefore must be regarded for the purposes of this action as a citizen of Wisconsin. But it is said, and here the objection to the jurisdiction arises, that the defendant is also a corporation under the laws of Illinois, and is therefore also a

citizen of the same State with the plaintiff. The answer to this position is obvious. In Wisconsin the laws of Illinois have no operation. The defendant is a corporation and as such a citizen of Wisconsin by the laws of that State. It is not *there* a corporation or a citizen of any other State, being there sued it can only be brought into court as a citizen of that State, whatever its status or citizenship may be elsewhere. Nor is there anything against this view, but on the contrary much to support it, in the case of *The Ohio and Mississippi Railway Co.* v. *Wheeler,* 1 Black 286."

The court then reviews this case, and in so doing cites those portions of the opinion, which, as I understand, were disapproved by the court in the *Railroad Company* v. *Harris,* above quoted. Chief Justice Taney in delivering the opinion of the court in that case expressly says, that the plaintiff, a corporation chartered in two States, must in the United States courts be regarded as a citizen of both States equally, and that such would be the proper view of their status, though they were to be regarded as but one corporation, and that they could not maintain a suit in the United States courts against a citizen of either State in which they were incorporated. The very reverse is held in this case, and yet they are said to be entirely reconcilable. The Supreme Court of Pennsylvania evidently regards these two decisions of the Supreme Court as irreconcilable for in the case of *The County of Allegheny* v. *The Cleveland and Pittsburgh Railroad Co.,* 51 Pa. St. 228, they decided, that " A suit by a corporation created by the concurrent legislation of two States is a suit, in which the citizens of each State are joined as plaintiffs.' If the defendant is a citizen of either of these States, the suit can not be maintained in the United States courts."

This decision was based entirely upon the opinion of Chief Justice Taney in the case of *The Ohio and Mississippi Railroad Company* v. *Wheeler,* 1 Black 297. And yet an exactly opposite conclusion was reached in the case of *The Railway Company* v. *Whitton,* 13 Wall. 283;

and the court singularly enough says, there is nothing against this in Chief Justice Taney's opinion. It seems to me that the position, that in the United States courts the defendant was a citizen of both States, and could not therefore be sued by a citizen of either, is answered very unsatisfactorily by the court, when it says, it would only be regarded in a suit in the State court as a citizen of the State in which the suit was brought. It seems to me to be perfectly immaterial how it would be regarded in such a suit. The question is: How should it be regarded in the United States courts? If, as Chief Justice Taney says, as a citizen of both States, then no suit would lie in the United States courts, no matter how it might be regarded in a suit in a State court. The principles decided in *The Railway Company* v. *Whitton's adm'r*, 13 Wall. 270, were followed in the case of *Muller* v. *Dows*, 4 Otto (94 U. S. R.) p. 444.

In *Evans* v. *Monot*, 4 Jones Eq. 228, it was held, that a corporation created by a State and carrying on its operations within the State, has its *existence* in the State, although its office business be carried on in another State.

In *The State of Maryland* v. *The Northern Central Railway Company*, 18 Md. 193, it was decided that a corporation chartered by two States, and doing business in each State, must be treated by the courts of each State as a domestic corporation to the extent of the State in which it acts, and as a foreign corporation as regards the other sources of its existence.

However contradictory and irreconcilable may be the decisions of the Supreme Court as to the residence of a corporation chartered by two States, when the suit is in the United States courts, there is one point on which the recent decisions of the Supreme Court, and all the decisions of the State courts which I have examined agree ; and that is, if a corporation be chartered in this State, and accepts its charter by actually doing business here as a corporation, it must, in a suit brought here in our courts, be regarded as a domestic corporation having its

residence in this State. And we may add, that a legislative authority to a foreign corporation to do business in this State, accepted by actually doing business here, has precisely the same effect as a formal charter. Such corporation in a suit here must be regarded as a domestic corporation having its residence in this State, no matter where its officers may reside. See *Continental Ins, Co.* v. *Kasey*, 27 Gratt. 216 ; *Connecticut Ins. Co.* v. *Duerson*, 28 Gratt. 630, 642, 643.

We will now examine the West Virginia cases, and determine whether they are in this respect in accord with the decisions elsewhere.

In the case of *Goshorn et al* v. *The Supervisors of Ohio County*, 1 W. Va. 308, it was held, that the Hempfield Railroad Company was a corporation of this State, though it never was formally chartered by Virginia, but merely authorized to do certain things in the State and extend its road to the city of Wheeling. The question whether the Bank of the Valley was a foreign or domestic corporation was decided in the circuit court in the case of *The Bank of the Valley* v. *Gettinger*, 3 W. Va. 309 ; but this court not considering the question as properly raised by the record declined to decide it and expressed no opinion on the subject.

In the case of *The Farmers' Bank of Virginia et al.* v. *Gettinger*, 4 West Va. 305, this court decided that the Farmers's Bank of Virginia was a domestic corporation and not liable in April, 1866, to be proceeded against by attachment as a non-resident. This bank though located in Richmond had branches in this State, one of which was located at Lewisburg and one at Charleston. By the 8th section of article 11 of the Constitution of this State it was provided, "that such parts of the common law and laws of the State of Virginia, when this Constitution goes into operation, as are not repugnant thereto, shall be and continue the law of this State until altered and repealed by the Legislature." Judge Brown in his opinion in that case says: "This then continues the

charter of the Farmers' Bank of Virginia with its branches in this State in full force;" and he again says:— "That the fact, that this and other banks similarly situated may continue to be Virginia corporations, is wholly immaterial, and is no more repugnant to the fact that it, and others so situated, are also domestic corporations of this State, than that the Baltimore and Ohio railroad and the Hempfield railroad are domestic corporations of this State by virtue of the laws of Virginia in force before the separation, notwithstanding both of said companies are also foreign corporations, the one of the State of Maryland and the other of the State of Pennsylvania *Goshorn* v. *The Supervisors of Ohio County*, 1 W. Va. 308; *Ott* v. *McHenry*, 2 W. Va. 73. The Farmers' Bank being a domestic corporation in Virginia before the division, and having branches in the territory which became West Virginia from the date of division, continued in law and in fact a domestic corporation of the new State as effectually as it had been under the old, and as such was liable to be sued, and was not liable to be proceeded against as a foreign corporation." Judges Maxwell and Berkshire concurred in the conclusions reached by Judge Brown.

There are some portions of his views not quoted above which are doubtless unsound, and this may be the reason why the other judges only concurred in his conclusion He says, for instance: "That each of the branches of this bank was as perfect a bank in itself as the mother bank at Richmond, or any other bank corporation having its officers and directors, its banking house and capital stock and banking business, organized and conducted under its charter, with charter rights and privileges. Such it was under the laws of Virginia before its separation. Is it less so now?" This is true to a large extent; but it is not literally correct. It is not true, that each of these branches was as perfect a corporation in itself as any other bank corporation. Though having many of the powers of other banks which had no branches,

*1878 Special Term.*

*Hall et al.*
*v.*
*The Bank of Va. et al.*

these branch banks did not have all. They were not in themselves corporations and could not be sued as such· The mother bank was alone liable to bring suit for the contracts of the branches; though suit could be brought in the counties where the branches were located. See *Tompkins* v. *The Branch Bank,* 11 Leigh 372. Still this does not affect the soundness generally of Judge Brown's reasoning. The conclusion reached, that the Farmers' Bank of Virginia was in April, 1866, a domestic corporation of this State, and not liable to be proceeded against as a non-resident by attachment, is in accord with the views I have expressed. For it was permitted by the terms of our Constitution to act as a corporation within this State and to do business by its branches located here ; and there were such branches actually located here at that time ; and they were therefore properly treated then as domestic corporations. A more serious error of Judge Brown was in saying that the Farmers' Bank of Virginia was a domestic corporation from the date of the division of the State of Virginia and the formation of this State. From what I will presently show it could not have been a domestic corporation of this State till the close of the war. But this statement was a mere *obiter dictum* of Judge Brown, evidently made without having his mind directed to the distinction which will be taken in this opinion.

It is claimed however by the appellees' counsel, that this decision is unsound and was tacitly, though not expressly, disapproved in the case of *Parker et al.* v. *Donnally et al.* 4 W. Va. 648. The appellants' claim in that case was based on an attachment sued out in August, 1867, against the Bank of Virginia as a non-resident defendant. The court decided, that the fund by a legitimate transfer had passed to the appellee before the attachment. They said nothing about the validity or invalidity of the attachment against the Bank of Virginia; and it is inferred by the counsel for the appellees, that the court regarded the attachment as valid

and intended to disapprove the case of the *Farmers' Bank* v. *Gettinger*, which counsel assume presented so far as the attachment was concerned the same question. These cases were decided within one year of each other; and I apprehend that if the court had regarded the attachment against the Bank of Virginia and the Farmers' Bank of Virginia as standing on the same footing, they would probably have decided the last case by holding the attachment a nullity, as they did in the first case. But in that latter case it was proven that the Bank of Virginia was located at Richmond, that the directors then appointed the directors at Charleston, the only branch it had in West Virginia. They appointed no directors after the war, and the board, who were there when the war broke out, refused to act as such after 1861; and the cashier and other officers dissolved their connection with the branch; and the assets and affairs of the branch passed into the hands of the president who was recognized by the parent bank at Richmond and authorized to pay depositors and recover payment of debts. It does not appear, that any sort of business was ever done at this branch bank after the war. Under these circumstances as it might well be the court may have regarded, the two cases as essentially different and that though no attachment could properly be issued against the Farmers' Bank of Virginia in 1866, when it would seem from Judge Brown's opinion they had a branch in fact in this State organized, yet they may well have hesitated to hold this as to the Bank of Virginia, who had never had an organized branch bank in the State since its organization. This I presume was the reason they preferred to decide this last case on other grounds.

The appellants' counsel on the other hand insist that the case before us is governed by that of *The Farmer's Bank* v. *Gettinger*. Does this case come within the principles laid down in that case, and which accord with those laid down by the Supreme Court, the Court of Appeals of Virginia and that of other States? When the attach-

1878
Special Term.

Hall *et al.*
v.
The Bank of Va.
*et al.*

Syllabus. 1, I.

ment issued, April, 1866, in the case of the *Farmers' Bank of Virginia* v. *Gettinger*, the Constitution of the State of West Virginia, as shown by Judge Brown, authorized that bank to establish branches in this State; and as they then had such branches, they were then, on the principles I have laid down, properly regarded as domestic corporations not liable to be proceeded against by attachment as non-residents. But when the attachment issued in this case, November 30, 1864, the Bank of Virginia had no statutory or other authority to do any business in this State. It being a corporation located in the city of Richmond, the capital of the Southern Confederacy, and under the absolute control of governments then at war with this State and the United States, we could not even by an express statute have authorized them to establish a branch bank in this State and carry on business during the war. Such legislation would have been treasonable. A public enemy could not by any act of this State have been permitted to carry on business within the State during the continuance of the war; and of course the general provision in our first State Constitution continuing in force the statute law of Virginia could not fairly be interpreted as conferring authority on a public enemy, while such, to establish a branch bank in our State. But if it had expressly done so, it would have been inoperative as it would have been a breach of allegiance on the part of the State to the Federal Government. Had such a provision been in our Constitution, the State never would have been admitted into the Union.

The Bank of Virginia then, when this attachment issued, never having had any authority to establish a branch bank in this State stood then in the precise position of the Bank of Richmond, or any other local bank of Virginia. And can there be a question but that they were non-resident corporations, corporations chartered by another State and never authorized to do business in this State? I must therefore conclude that in Novem-

ber, 1864, when this suit was brought and the attachment issued, the Bank of Virginia was a non-resident of the State and liable to be proceeded against as such by attachment.

It remains only to consider the question, whether the court erred in sustaining the plaintiffs' demand for notes that were payable at other branch banks than that at Charleston, no demand for their payment having been made at the branches at which they were payable before the institution of the suit.

It has been decided in Virginia, that if a note be payable at a branch of a bank at a particular specified time, it is not necessary to aver and prove due presentation of the note and demand of payment at the bank, in order to entitle the plaintiff to recover of the maker of the note. See *Watkins* v. *Crouch*, 5 Leigh 522. *Armistead* v. *Armistead*, 10 Leigh 512. From these decisions it appears to have been doubtful, whether if the note was payable at a branch bank on demand instead of at a specified time, it would or would not be necessary to aver and prove presentment and demand at such branch bank before suit. To settle this question, and to put bills of exchange accepted or notes payable at a specified place on demand on the same footing as bills accepted or notes payable at a specified place and time, was, it seems to me, one of the objects of the passage of the 1st section of chapter 144 of the Code of 1860, page 628. This provides, "If a person accept a bill of exchange, payable at the house of a banker or other place, without further expression in his acceptance, such acceptance shall be deemed a general acceptance, and the presentment of the bill may be either at such place, or as it might have been if no such place had been specified in the acceptance. If an acceptor shall in his acceptance express that he accepts the bill, payable at a banker's house or other place only, and not otherwise or elsewhere, such acceptance shall be deemed a qualified acceptance. But as against the maker of a note or the acceptor of a bill, whether the accept-

80

ance be general or qualified, it shall not be necessary to aver or prove presentment for payment at the time and place specified in the note, bill or acceptance. Such maker or acceptor may however set up as a matter of defense any loss sustained by him by reason of the failure to make such presentment."

But if it were admitted, that ordinarily there is a difference, as to the necessity of a demand of payment at the specified place, between a note payable to a particular person at a specified time and a note payable to bearer at at a specified place on demand, still in the particular case before us no such prior demand of payment of these notes of the branch banks of Virginia at these branch banks respectively located in Virginia would be required. No such demand could have been made by the plaintiffs, as these branch banks were within the boundaries of the territory held then by the Confederate States as a public enemy; and if made, such demand must necessarily have been entirely unavailing. Payment could not have been made on such demand both on account of the then condition of the banks caused by the war, and also because it would have been the duty of such branch banks, even if they had had the ability to pay, to have declined payment at that time to the plaintiffs. The plaintiffs then stood in relation to them as public enemies; and a payment to a public enemy of a debt on his demand would then have been a breach by them of the laws of war, and have subjected them to pains and penalties. No such useless demand therefore could be required, and no possible injury resulted to the Bank of Virginia by the failure to make such demand. And even had it ordinarily been their duty to make such demand before the institution of a suit, it could not be held necessary under these circumstances.

I am therefore of opinion, that the circuit court did not err in directing the payment out of the assets attached of the whole of the plaintiffs' debt including the notes payable at branches in Virginia, payment of which had not been demanded before the suit was instituted.

The decrees of the circuit court appealed from must therefore be affirmed ; and the appellees, Hall and Smith, must recover of the appellants their costs expended in this court, and $30.00 damages.

JUDGE JOHNSON concurred.

HAYMOND, JUDGE:

I have doubts whether generally a bank may be sued upon its notes payable on demand at the parent bank or a branch thereof, until such demand is first made at the bank or branch where payable ; but I concur with Judge Green in the residue of his opinion, and regard the question of demand as immaterial under the circumstances of the case.

DECREES AFFIRMED.